We're sorry to report Judge King had a back problem and couldn't make it over to New Orleans but as you see she's fully ready to go on our first on our cases this week and I have a monitor I can see her here and if she wants if you want to ask a question why don't you raise your hand and I'll try to yes I mean that might you can speak up yeah whatever will facilitate things welcome you all here today I think the weather is going to clear up a little bit later but anyway it's always dark when it doesn't we have a traffic light system the yellow light means you have two minutes left in your presentation and when the red light comes on we ask you to conclude your remarks unless you're answering a question from the court also we've read the briefs and record excerpts in this lengthy case but we may not have read the entire record so we appreciate those citations when they're appropriate with that the first case in the morning is number 2340217 Texas Medical Association v. United States and my list, my list Mr. Soter Good morning Your Honor and may it please the court Kevin Soter from the Department of Justice for the Government. The No Surprises Act was landmark bipartisan legislation designed to protect patients from ruinous medical bills in emergencies and other situations where they couldn't control receiving care and network because a fixed fee hasn't been negotiated ahead of time Congress established a negotiation and arbitration You need to speak into the mic please. Is this better Your Honor? Well maybe. Take three. So because a fee hasn't been negotiated ahead of time this arbitration and negotiation process between the insurer and the provider is necessary and to make that work Congress directed that three government departments issue regulations fleshing out some additional details of that process that weren't in the statute. As relevant here the departments exercise that authority to adopt modest procedural requirements that provide a degree of uniformity and predictability to that arbitration process. Plaintiffs assert that those regulations will constrain the discretion that Congress vested in these independent arbitrators but the results plaintiffs fear would only come to pass if arbitrators were to overlook the standards set forth in those regulations which is to determine in their own best judgment which offer quote best represents the value of the item or service at issue. So on standing plaintiffs have not shown that arbitrators would exercising their independent judgment depart from that best represents the value standard which plaintiffs agree with. And on the merits plaintiffs have not shown that the rule is inconsistent with any of Congress's directions to arbitrators. And I'm happy to address the court's questions on either issue beginning with standing since of course the court will need to begin there. I think that the basic point here is that arbitrators are the ones exercising independent judgment under this rules, under these rules. Plaintiffs theory of harm is that the results of these arbitrations on the back end will result in lower prices being decided by these arbitrators. But in order to show standing for that they have to get through the sort of rigorous test that applies when the theory of injury depends on the actions of independent third parties which here are these arbitrators following these rules. Let me ask you a standing question. Suppose Congress passes a statute to hear a bunch of your entitlements in the arbitration. And the departments come forward and they issue a rule and they say we don't really care very much about that. We are going to make the arbitrations determined by a coin flip. Would the plaintiffs have to wait until they lose the coin flip to challenge the rule? Not necessarily, Your Honor. I think that's a very different case from what we have here. I understand it's more arbitrary, but I don't understand how it helps you on stance. So clearly on the merits, that's by definition arbitrary to capricious. It's contrary to law. It ignores the statute. Like I told you, the merits are easy. What I don't understand is how is it different for standing purposes? I think when there is a significant enough departure from the result you would expect were the statute being followed, then there can be enough of a showing there. But the issue here I think is that the plaintiffs have to distinguish their case from if you imagine sort of regulations that just describe what sort of typeface the arbitrators need to use in writing up their decisions. So if the regulation had said Times New Roman is the typeface you must use, that's not anywhere in the statute. Plaintiffs say that contradicts the comprehensive statutory scheme. I think they would have to show that using a different typeface would actually impact in some material way the outcomes at the end of the arbitration. Well, you think it's going to impact the outcomes of the arbitration. Otherwise, you wouldn't say that this is going to impose predictability and reliability and make it more efficient. I mean, how is it going to do that? I assume you – let me just ask it open-ended. How do you think that the regulations are going to make the outcomes of the arbitrations more predictable than the statute that Congress passed? So I think the main way is that they provide a set of rules of the road and basic guardrails for arbitrators to follow. The difference from sort of an example that's more deterministic about the outcome is that this is not pushing the results toward any specific number, and it doesn't – I don't think it's right to say that it pushes it toward this QPA number that plaintiffs are concerned about, especially given the express disclaimers throughout the rule that arbitrators are not to presume that that number is correct. So the sort of consistency that we're talking about is that when two different arbitrators, potentially from one of these different certified independent entities, evaluate a similar type of claim, we want them to have the guardrails necessary to reach a similar result in that claim so that over time— Well, but the whole point about this is a lot of – does this statute go beyond emergency services? Does it go to any kind of medical services? It goes to, I think, three categories of services in which the patient can't really control whether they're in network. It's emergency services, certain services in network facilities, so like when you have neurologists— Well, I understand that. I understand that. But, I mean, what kind of – in other words, hospital – it has to do mostly with clients who are in acute care, right? It has to do, I think, with the category of patients who don't have control over whether they can see a network doctor. Well, what – okay. The most typical examples are that emergency department. Right. I'm not trying to get you hung up on it. But my point is that medical practice often varies depending on the acuity of the patient, among other factors, and how can you say that the whole point of this IDR service is that the arbitrator is supposed to look at each individual case and draw inferences from that? Yes, Your Honor, and I think— Well, then, so what's the point of guardrails and all that business? I think the same sort of point that, for example, the federal rules of evidence provide in federal court. You may look at, for example, the rule that says exclude irrelevant evidence. Well, the IDRs, are they bound by the federal rules of evidence? They are not, which is why— I hope not. Which is why I think that some of the common-sense rules in the federal rules of evidence, such as the prohibitions on considering irrelevant, duplicative, non-credible information, are in these regulations, and those are the sorts of rules that, for an agency-conducted adjudication, for example, the Administrative Procedure Act directs the government to promulgate those sorts of rules of the road when going through— What does that have to do with the IDRs? So the government has been tasked expressly by Congress with establishing this process through regulations. Right. You're just drawing an analogy. You're not saying it's mandatory. Your Honor, yes. I'm saying that the departments were mandated by Congress to come up with reasonable rules of the road, and the ones that are at issue here meet that standard set forth. The threshold to this is the QPA determination, which apparently is currently somewhere in the briefing process in this Court, so I'm not criticizing that. But apparently whatever happened with developing the QPA must have been not to the liking of many providers because one of the briefs noted that these departments had estimated there might be 20-some thousand requests for IDR, and instead there were 14 times that many in the first year, so that indicates something's not going according to plan in this process, right? Correct, Your Honor, that far more disputes have been submitted to this process than were estimated. In our view, that underscores the need for a set of uniform rules, as Congress directed that there must be, quote, one independent dispute resolution process. And so as to that issue, I think that's where the practical sort of what's happening on the ground— So they're going to be able to handle these as readily as the immigration courts, right? I'm not sure about a comparison to other courts. Well, suppose—I mean, just to take one of the points of this regulation, what's the purpose in requiring the IDR, whoever it is, to write findings only if he deviates from the QPA when all he's getting paid on each of these reviews is between $200 and $700 or so? Your Honor, I think you have to look at that written decision requirement in totality instead of looking at just the isolated sentence plaintiffs pick out, because if you look at the sentence before that one, what it says is— and this is at page A31 of the government's addendum— it says that the certified IDR entities' written decision must include an explanation of their determination, including what information the arbitrator determined demonstrates that the offer selected— I'll skip some words here—is the offer that best represents the value, including the weight given to the qualifying payment amount and any additional credible information that the arbitrator considers. And so in order to satisfy that requirement to provide a sufficient explanation to understand the decision, the arbitrator would need to explain the weight given to this QPA, which is the proxy for an in-network rate, and also the weight given to any other information considered. The final sentence that plaintiffs have challenged, I think, just elaborates on what that means in this circumstance where you're following the structure of the rule. The rule has set forth a sequence of analysis, not a presumption, but a sequence. And if you start with one number, then consider additional information, then land at a number that's not the number you started with, necessarily in order to explain why you did that, you would have to explain why the QPA was not reflecting an accurate value for the out-of-network service. Well, I thought these IDR people were supposed to be experts in knowing both the medical part and the law. Yes, Your Honor, and I think just as sort of to go back to the federal rules of evidence example, I think no one questions that judges are experts in evaluating evidence. But some rules of the road for them to follow are still helpful, and that's why this rule says, for example, don't look at the same information twice. Do these departments view IDR as the last step on the road, or just a way to buy time pending judicial review? In other words, when you've got a baseball procedure, A, B, arbitrator picks between them. I don't understand why people like that, but that's what it is. Arbitrator picks, and if one side doesn't like it, they go to judicial review. But why are you trying to push the arbitrator? There are transaction costs to pursuing these reviews, are there not? Yes, which I think is why Congress designed this scheme, and there's some evidence that the reason for picking this sort of baseball-style scheme and many other aspects of the structure that I think are discussed in detail in one of the amicus briefs from the America's Health Insurance Plans to try to encourage parties to reach private resolutions of these disputes so that in that 30-day required open negotiation period before you can ever submit an offer to arbitration, many parties will reach a resolution, and there's also a cool-off period after any arbitration so that you can't have a similar dispute submitted again involving the same parties. And I think the idea of all of that is to try to end up with some sort of consistent results so that when particular providers and insurers are negotiating over similar services over time, they start to understand what to expect from arbitrators so that they don't need to go through that full process, which does also have, I think, another piece of that is the limited judicial review on the back end. What's your understanding of the provision that says the IDR person is supposed to not evaluate or not take into consideration evidence that is irrelevant or not related? What does not related mean? I think it means—so I think that that is—it's not credible, not relevant, or not duplicative, so there's no separate—I think not related is what we understand as the relevance requirement. And it's in the arbitrator's judgment to determine what is relevant to their determination. The regulation says just don't rely on the information to the extent it's not relevant. It doesn't say don't decide that it's more persuasive than the QPA. Does the arbitrator have the same leeway to apply the exact same standard to the QPA? The arbitrator is not asked to—or is told not to sort of recalculate the QPA. I think Congress was clear in designing this scheme that it did not— that it expected the sort of process of calculating the QPA and oversight to fall on the departments through audits and on state authorities through audits. And what the rule clarifies is that it's not on the arbitrator to sort of look under the hood of the QPA and try to pull out all of these different plan contracts that were used to— So when the insurance company comes in and says our QPA is X, the arbitrator has to take it no matter whether it's incredible, duplicative, or not relevant. But the not duplicative, not relevant, and not—not duplicative, not relevant, not related to, or whatever the thing is, that only—credible, sorry—that only applies to the provider. It's one-sided. It is not one-sided, Your Honor. It just—the point is to get these arbitrators not to sort of recalculate the QPA itself. It's used at many points in the process, including to determine patient cost sharing. And so I think Congress was quite clear in its design that it expected the QPA to be an input, an important one to the arbitration process, but not for the arbitrator to go back and go through this complicated process of pulling all of the insurer's plan contracts, figuring out what the median is, going by specialty, by region, all of these things that are detailed in pages of the statute and then pages and pages of the regulations. But the way you read subsection C, the QPA is the starting point. Yes, Your Honor. The QPA is the starting point under the statute. But starting point is quite a different thing from presumption in favor of it. And I think that's what these—this rule recognizes is that—that even if there is any issue with presuming in favor of something, starting there is not presuming in favor of it. It's just starting there. If you look at the structure of the statute and the role that the QPA plays in it, I think that's helpful in bearing that out. I see that my time has expired. When you get back up, I'd just like to know, why wouldn't this process have worked perfectly well without these regulations, number one? And number two, if the purpose is to facilitate reasonable negotiation and so on, why is it that the Blue Cross amicus brief repeatedly says, this is really helpful to us because it is pushing everybody toward the QPA? And if you need to, I'll find the sites. But I was very amused about that. All right. Next up is Mr. McArthur. Good morning, Your Honors, and may it please the Court. Eric McArthur for the TMA plaintiffs. I have with me a counsel table this morning for the air ambulance plaintiffs, Mr. Stephen Shackelford. The statutory issue in this case breaks down into three questions. First, do the departments have any authority at all to impose extra statutory requirements on arbitrators' weighing of the statutory factors? Second, if so, are these rules consistent with the expressed terms of the statute? And third, if so, do these rules reasonably implement the statute? To prevail in this case, the departments need a yes to all three of those questions. In fact, the answer to all three of them is no. I want to begin by explaining first why the department's rulemaking authority doesn't extend into this space at all. And then I will turn to the specific provisions that were challenging and explain why, in any event, these rules are inconsistent with the statute. So on that first point about the scope of the department's rulemaking authority, they principally defend the rule by saying they are simply exercising their expressed rulemaking authority to fill a supposed statutory gap. But there is no relevant gap in this statute. What they are calling a gap is instead the zone of discretion that Congress granted to the arbitrators to weigh the evidence before them within the parameters that Congress itself set out in the statute. That is the best inference here from the statute's text, from its structure, and from its history. As to text, Congress described the decision-making process in meticulous detail. And to your question, Judge Jones, about why this process wouldn't have worked just as well without these rules, Congress gave the arbitrators self-executing instructions. It, first of all, limited them to choosing between one of the party's two competing offers. They're not constructing their own rate from thin air. And then it spelled out in detail the precise factors that arbitrators shall consider and shall not consider in choosing between these offers. So I think Judge Kernodle got this exactly right when he said in his opinion in TMA-1 that especially in a statute this detailed, if Congress had wanted to further restrict how arbitrators weigh the statutory factors, it would have said so. As to structure, Congress created an independent dispute resolution scheme, not a scheme of agency adjudication, ensuring that these important determinations are insulated from political influence. The arbitrators are not agency employees. They are private arbitrators who are paid and selected by the parties and whom political and legal expertise needed to resolve these disputes. And Congress charged them with resolving the disputes. It spoke directly to them in the statute and gave the departments no role in making payment determinations, not even in reviewing the arbitrators' decisions. Isn't there another provision of the statute that expressly does give the departments rulemaking authority about calculating the QPAs? There is. There is. And that is in contrast to the delegation of rulemaking authority here, which does allow them to set up the IDR process but specifically says that the rules, under those rules, the arbitrators are to determine the payment amount in accordance with the succeeding provisions of the statute, not in accordance with the department's regulations. And as to history, we know that Congress was intensely focused on this very point, how much weight should the QPA get in determining provider reimbursement. And it considered a variety of bills that would have privileged the QPA in various ways, including bills that would have made it the presumptive payment amount from which arbitrators could depart only in the event of quote, unquote, extenuating circumstances. Congress rejected that model. And in its place, it adopted a compromise approach in which the QPA is one, but only one, of the mandatory factors that arbitrators have to consider. And Congress enacted this statute against a backdrop of longstanding case law that says when Congress charges a decision-maker with considering a list of factors and doesn't prescribe weights or a procedural order, that constitutes a vesting of discretion in the decision-maker to weigh the factors as the decision-maker sees fit. And that is the best way to read Congress's instructions to the arbitrators here. Turning then to the specific requirements that we're challenging. Because I don't need to persuade you on that first point to win that case, nor does the court need to decide it. Because the rules, even if the departments have authority to impose rules in this space, the rules still have to be consistent with the statute's expressed terms, and they have to reasonably implement the statute. And the rules here flunk both of those requirements. And I want to start out with what I think is the most problematic of the provisions that we've challenged, and that is the so-called double-counting prohibition. That is the rule that says that arbitrators may not give any weight to any of the other statutory factors that Congress required them to consider if that information is already accounted for in the QPA. There are three major problems with that. The first is it conflicts with the statutory command to consider all of the factors and not just the QPA. Congress undoubtedly understood when it enacted the statute that the QPA would be based on similar types of information that are set out in Clause 2. But it nonetheless commanded the arbitrators to consider the Clause 2 factors in addition to the QPA. So in effect, where Congress said to the arbitrators, you shall consider these other factors, the departments have now said, you shall not consider these other factors unless. Or viewed another way, the statute says the arbitrators shall consider the QPA and the other statutory factors. In essence, the departments have added language, so it now says the arbitrators shall consider the QPA and, if not already accounted for by the QPA, the other statutory factors. That's not filling a gap. That is rewriting the statute. That is a materially different statute, and the departments are not free to impose conditions on Congress's unconditional command. So that's problem number one. Problem number two is the double-counting prohibition in practice usurps the discretion of the arbitrator by anchoring them to the QPA. The best way to see this is in the department's own Example 3, which is codified in the text of the regulation. That example posits a QPA that corresponds to a billing code that assumes high patient acuity. And what the departments say is the double-counting prohibition prohibits the arbitrator from giving any independent weight to case-specific evidence of high patient acuity, because that's already accounted for in the billing code to which the QPA was. Case-specific evidence of what? Of high patient acuity. And so the fundamental problem with that is it forces the arbitrators to use the QPA as simply a potential reason to depart from that baseline rate. That is not the scheme Congress enacted. The arbitrator may wish to proceed from a different baseline, for example, the party's prior contracted rates, which is one of the Clause 2 factors. And maybe the baseline from which the arbitrator wants to proceed doesn't incorporate information about high patient acuity. And so the arbitrator may wish to look at that case-specific evidence and say, I need to adjust upward from the baseline that I have chosen to use here to account for that case-specific evidence. The Department's rule prohibits the arbitrator from doing that because the information is already accounted for in the QPA. Mr. McArthur, the relevant analog here, it strikes me, is the sentencing guidelines. It looks a lot like the sentencing guidelines. There are some similarities, to be sure. Right. So as you know, in the sentencing guidelines circumstance, the Supreme Court has told district courts you must start with a correctly calculated guidelines sentence. You have to. And then you can depart if you look at all the relevant factors and whatever, but then there's procedural requirements for departing, and we have different standards of review for departing. And so as a consequence, the whole scheme in sentencing guidelines is we want you, the Supreme Court is effectively telling our district courts, to kind of use that as a baseline because we want to promote regularity and comparability and we want everybody to be treated the same to the extent possible, like cases being treated alike. And it just seems like it's not the statute that Congress wrote here, right, which is that Congress seems to have said, look at all of this stuff, and there isn't a baseline. That's what I mean. And I take this as kind of your construction of C, Romanet 1, that in general, the two different clauses is like, look at all of it, but there isn't a starting point in the way that we would think about it in the guidelines circumstance. Am I imposing a fair analog? You absolutely are, Judge Oldham. And it's not only that Congress didn't write that sort of statute here, it would have created that sort of QPA-centric regime where you're looking at the QPA first and primarily and only treating other information as a potentially extenuating circumstances. That is not the model Congress chose. I did want to mention what I think is the third key problem with the double counting prohibition, which is that it is fundamentally unworkable. And that is because the QPA is a black box to providers and arbitrators alike. It is a number that is calculated in secret by the insurer based on the very limited disclosures. And so how are arbitrators supposed to know whether information is or is not accounted for in the QPA? You can see this in the department's example one. They have an example where they posit a service that is provided by a level one trauma center. And what the double counting prohibition says is that before the arbitrator can give any weight to the scope of services provided by the facility, that is one of the clause two factors, they have to determine that that's not already accounted for in the QPA. So what does the example say? How is the facility supposed to make that showing? They say the facility can come forward with evidence showing that the contracted rates on which the QPA was based were with facilities that don't have the scope of services of a level one trauma center. But providers do not have that information. They have no idea whose contracted rates the QPA was based on. Only the insurer has that information. And so the result is, as a result of the double counting rule, the arbitrator can give no weight to the fact that this service was provided by a level one trauma center. Are the arbitrators working with claims against one insurer or more than one? Always against one insurer. One insurer. So the Blue Cross arbitrator does all the blue. Right. There are batching rules. I was wondering what's the potential for these QPAs becoming price fixing? Interesting question. Not one I've thought about. Well, that's OK. Then pass it on. And just to tie off on the double counting prohibition, all of the problems that I outlined are greatly magnified by the written explanation requirement under which the arbitrator has an additional explanatory burden if and only if the arbitrator gives weight to information other than the QPA. It's like the guidelines. Yeah. It makes perfect sense. Right. So if the arbitrator who, as Judge Jones pointed out, the arbitrators are paid by the case. They're not paid by the hour or paid by the word. If the arbitrator dares to give any weight to additional information, the arbitrator has to explain in writing why that information was not accounted for in the QPA. But what has this to do with the role of the departments or anybody? I mean, this is just telling him to do more work. Right. If it got to judicial review, so what? I assume it's still substantial evidence or arbitrary and capricious or what? No, I think it's even more limited than that because it's review under the standards of the Federal Arbitration Act. But it's still a deterrent to the arbitrator. OK. It's absolutely a deterrent to the arbitrator relying on any information other than the QPA because what happens if the arbitrator decides to give weight only to the QPA and to disregard all of the other information before it, the arbitrator does not have to explain why that other information was accounted for in the QPA. And so the skew here is not difficult to discern. I will touch briefly on the other provisions that were challenging, starting with the QPA first requirement. Mr. McArthur, I want you to get out all of this. But would you just mind? I would like to talk to you about the remedy at some point. So whenever you're ready to turn to it, I have a couple of questions for you. But feel free to go. OK. I will make sure I reserve a couple of minutes at the end to talk about the remedy. So quickly then on the other provisions that were challenging, QPA first. The departments principally justified that requirement in the rule as an adjunct to the double-counting prohibition. They said you should start with the QPA so that as you go through the other factors, you're in a position to evaluate whether they're already accounted for. So it falls together with the double-counting prohibition. There's no other rational reason to force arbitrators to start with the QPA unless, of course, you're trying to anchor them to the QPA. Departments also said, well, it's a quantitative figure. The arbitrator may have other quantitative figures before it. It may have the party's prior contracted rates. It may have prior allowed amounts the insurer has paid to the provider. And there's no reason why the arbitrator can't begin with those figures if it finds them more probative. As to the related to requirement, that is the provision that requires the arbitrators to give no weight to the other statutory factors if they find that the factors do not relate to the party's offer. The fundamental problem with that is the statute makes it expressly clear that information on the other statutory factors always relates to the statutory factors. That's clear in the provision. That talks about what the parties may submit. It says the parties may submit information relating to their offers, including information on the Clause 2 factors. And it's clear in the provision that directs the arbitrators what to consider, which says you must consider the Clause 2 factors full stop, without stopping to ask whether that is related to the offer, because information on the Clause 2 factors will always be related to the offer. Finally, the credibility requirement. The problem here is the Department's exempted the QPA. We're not arguing that arbitrators should consider information that isn't credible. And we're also not arguing that arbitrators have an independent obligation to recalculate the QPA. All we are saying is that if information comes before the arbitrator that shows that the QPA was incorrectly calculated, that is actionable information for the arbitrator. You can see that in the statute's terms itself. It doesn't say consider the submitted QPA. It says consider the QPA as defined in the statute. If the QPA is incorrectly calculated, it is not the QPA as defined in the statute. And there's no basis for requiring arbitrators to presume that that is a credible number. Before I turn to the remedy, Judge Oldham, I will briefly address standing. We have two independent bases for standing here, the procedural injury theory and the financial injury theory. And I thought your question, Judge Oldham, with the hypothetical about flipping the coin gets right to the heart of the matter. Congress has created a procedure that protects your concrete interests. The deprivation of that procedure can be a basis for standing, relaxing the ordinary standards of causation and redressability. No dispute that this is a procedure that exists to protect the concrete interests of providers in obtaining fair reimbursement for their services. The departments have two arguments as to why procedural injury doesn't apply here. First, they say the doctrine applies only when there was a procedural violation in the course of promulgating the challenged rule and not when the rule imposes unlawful procedures on a separate proceeding. That is foreclosed by circuit precedent in Texas versus United States. This court applied procedural injury standing in precisely that circumstance where a rule that was not alleged to itself be procedurally invalid imposed unlawful procedures on a separate proceeding. I realize I'm sitting next to the person who wrote that case, and so I'm sure she can correct me if I'm wrong. But, you know, as the department points out, the Tenth Circuit has said that we never actually used the phrase procedural rights in that 2007 Texas versus United States. There's no citation to Lujan Footnote 7, you know, the sort of font of the procedural rights doctrine. And so I'm wondering if it really matters. I mean, I gather the label doesn't really matter. If the point is you're injured, you're injured in an Article 3 sense if the department takes your statutory entitlements to a particular procedure and instead replaces them with something different. Whether you call that procedural rights in the Lujan Footnote 7 sense or you call that just contrary to law in a more traditional sense, it's standing all the way down, right? I think that's right, Judge Oldham. At bottom, what Texas stands for is if a rule effectively forces you to participate in an invalid proceeding, then you've got standing to challenge that rule. And the Consumer's Research case, which we put a 28-J letter in on Friday, does say that it agrees with other courts' characterization of Texas as a procedural injury case. But I agree, ultimately the label doesn't matter. The other argument that they make on this is they say we haven't shown a likelihood that vacating the rules will actually result in more favorable IDR outcomes. That is not the right legal standard. We don't have to show a likelihood. We just have to show some possibility. So take, for example, the Department's own paradigmatic case of procedural injury standing, a case where the agency unlawfully bypasses notice and comment in issuing the rule. No one thinks that to have standing to challenge that failure to provide notice and comment, you have to show that it is likely that when the agency complies with that procedure, it will issue a more favorable rule. All you have to show is some possibility. And we have easily cleared that low bar here. Even if we have to meet the higher bar of showing financial injury straight up, I think we've also met that bar here because it is obvious that in practice these rules are going to skew outcomes toward the QPA. They only ever operate to disqualify the non-QPA evidence, never the QPA. And so based on the face of the rules themselves, the way they operate doesn't depend on whether the arbitrators understand them as reimposing the vacated QPA presumption or any other formal presumption. Just based on the text of the rules and the way they operate, it is obvious that these will push arbitrators. That's exactly what Blue Cross says it's in its amicus brief. That's why they're here, Your Honor. And it is, as Judge Oldham pointed out, why the Department said these rules are necessary to promote predictability and encourage the parties to settle. I don't see how they could encourage the parties to settle unless they gave some additional information about how the proceeding is likely to be resolved. Happy to address any questions, Judge Oldham, on the remedy. My biggest one is from Team A's perspective, the difference between holding unlawful the regulation that's before us versus a universal vacature is zero, I assume, right? Because you're obviously a party here. You're obviously within the Fifth Circuit. I guess what I'm wondering is what is the stake really in this case for non-parties not in the Fifth Circuit such that there's a really important discrepancy between a more traditional APA remedy, and I don't mean to be argumentative in that. I realize I read your brief carefully. I understand your argument. This is well settled and goes way back to the 60s, et cetera. But a non-vacature remedy, maybe that's a less contentious way of saying it, versus a vacature remedy. Right. So I think there are two reasons why party-specific relief would be inappropriate in this case. One is it's flatly inconsistent with the Department's own position that there needs to be one IDR process. That is what the statute says, one IDR process. They are, in effect, saying that there should be two, one for TMA and TMA's members and the other plaintiffs that we represent, and one for everybody else. I don't think that's consistent with congressional intent here. I also don't think it would be an effective remedy for my clients because I think it is not realistic to expect that if arbitrators are applying this QPA-centric regime in 95, 99 percent of the cases that they hear, that they will be able to set aside that mindset and that habit and adjudicate the cases of the TMA members and the plaintiffs fairly without that thumb on the scale for the QPA. All right. Thank you. Mr. Soder, rebuttal. Thank you, Your Honor. Two points I'd like to make about the merits, both of which I think address the questions that Your Honor asked me at the end of my opening argument. The first is that I think it's important to take a step back and see the role that Congress gave to the QPA in this statute because there are several ways in which the QPA is important that help explain why it makes sense to treat it as a starting point to not question its credibility in individual arbitrations, et cetera. The first is it's the only one that's available to the arbitrator in every single case. Second, it's the only figure that is guaranteed not only to be available but is intended as a dollar figure that's a proxy for the question before the arbitrator, which is what's the value of the services that were provided by this doctor in this setting. Another is the structure of the statute. And here I think the statutory subheading is particularly helpful in showing that the non-QPA factors are referred to as, quote, additional circumstances. And the structure reinforces that, I think, because this is not a statute that says consider the following six factors. It's a statute that says consider the QPA and consider this cross-reference information that you'll find below, sorry, under a heading that says additional circumstances. And so I think that is what the rule properly reflects, is that this is what Congress intended there. Another is that, of course, the QPA is determinative with respect to patient cost sharing, and that may be something that the arbitrator wants to take into account. And another is that unlike the non-QPA... I don't understand what rule cost sharing plays. I didn't understand that. So I think the big picture here is that patients are being saved from these surprise bills, and on the sort of back end, the providers are being provided compensation. So I think the understanding both what the QPA is, which, of course, is the proxy for the in-network rate that would have been paid, and that the patient's portion has already come from the QPA calculation, I think is something that the arbitrator may wish to take into account. Cost sharing means redistribution from one group of patients to another. Is that what you're saying? I don't think so, Your Honor. I think I'm just saying cost sharing as in, so if the QPA for the service has already been calculated, it's set as $1,000, the patient has a co-insurance obligation of 20%, the patient has paid $200. So one thing that the arbitrator may want to keep in mind, considering that this is the only number in front of them that's guaranteed to be there that's a proxy for the value, is, well, the patient paid their obligation as if the value were $1,000. Why don't I start there and see, has the provider convinced me, in my own judgment as an arbitrator, that $1,000 is not the right number for this? And I think that gets to one of the questions that Your Honor asked before of sort of what are the amicus briefs supporting the government's position here saying? What I take them to be saying on the whole is that the rule that the government promulgated properly respects the role that the QPA plays in the statute without underweighting or overweighting it. And so I think the concern that's being expressed here, including by the patients and their amicus briefs and by the other amicus briefs, is that if this district court decision is left to stand, the QPA might not be given the appropriate weight that it's entitled to under the statutory statute. Who certifies these IDR people? Those are certified by the government, by the departments who are responsible for implementing the statute. And so the departments that have these various responsibilities under the statute, including the obligation to promulgate regulations to carry it out. You ever heard the NOS from Personnel as Policy? No, Your Honor. Okay. Well, go look it up. And so I think that addresses that question. And then to the broader question of why does this rule have these provisions at all, I think there are two reasons. One is that Congress mandated the departments to set up this process through regulation, and that's what the departments did. And you see sort of all of these regulatory pages that the departments carefully considered the issues. But as I asked you, I asked you at the beginning, why wouldn't the whole process work just fine if the IDR people are certified and then they look at the statute every time they're making a decision? I think that is very close to what the arbitrators are doing. That overarching standard that arbitrators are being asked to follow is to select the offer that best represents the value. And these additional guardrails that are there are not telling them to deviate from it. And why are we here? I mean, you promulgated a 68-page rule, and I just heard your answer to Judge Jones to say we don't really need it. No, Your Honor. I apologize if that's how it was understood. There's an important difference between a modest rule, which this one is, and an entirely meaningless one. Just like there's an important reason why there's the Federal Rule of Evidence saying don't put weight on non-credible evidence, don't put weight on irrelevant evidence, there's a reason to specify the types of decision — sorry, the types of guardrails that should be applicable to decision-makers. And I think the one thing I would encourage the Court to look through carefully that came up in Plaintiff's Counsel's argument is the specific examples that are in the rule. I think show just how much — and this starts at page 825 of our addendum — just how much this rule is saying it's up to the arbitrator to make these judgment calls. It's not saying follow what the departments might think about what's relevant, what's duplicative, what's credible. It's saying follow what the arbitrator would think in that context. I'm happy to address the questions about Vekater if Your Honor would like, but it's the amount of time. It's up to you. Fine. Okay. I think just two basic points here. The first is that this is a case in which there would still be one process if the remand without Vekater, as it's called under the cases, and we think that's appropriate here due to the disruption that getting rid of rules in this complicated scheme will cause. And the second point is even if the Court thinks that some Vekater is appropriate, our point about party-specific relief is just about the power of an Article III court to extend relief beyond parties. Thank you. All right. Thank you. Thank you very much.